Good morning, your honors. My name is Josh Bendor. I represent Appellants Arizona Attorney General Chris Mays and Secretary of State Adrian Fontes, joined by my colleague Karen Hartman-Tayez. I'll endeavor to reserve five minutes for a rebuttal. The district court in this case made several serious reversible errors, but I want to focus on two of them. First, the court reached to construe the voter intimidation guidance in an implausible manner that made it unconstitutional. That is the opposite of what courts are supposed to do, which is to adopt reasonable, narrowing constructions to avoid close constitutional questions. And second, the court did this implausible reaching in a case where the asserted injury was highly speculative along every relevant dimension, and so the court had no jurisdiction. This court showed reverse. I'd like to start with the voter intimidation provision, beginning with standing, then turning to merits, and then discuss standing as the canvassing provision. On the voter intimidation guidance, to have standing for this pre-enforcement challenge, the plaintiffs needed to clearly show that they intended to say certain things, that the guidance arguably prescribed them from saying those things, and that there was a that so long as the speech has the effect of harassing and intimidating, I mean, isn't that just extremely broad language that would, in fact, tend to chill speech? It would be broad if it were read in the manner the plaintiffs read it. But in fact, in context, based on the text, based on constitutional avoidance, based on the history of enforcement, it's simply a summary of what the Arizona intimidation statutes say. So why put that additional language that's above and beyond what the statute actually says in the guidance, which has the force of law? So, Your Honor, I would say the question for an injunction is not whether a summary was precisely written or not. No, that's not the question, and it's not the import of my question either. My question is the implication from putting broader language in the guidelines, which have the force of law in Arizona, is that there's an intent by the Secretary to make that enforceable and to enforce that in a broad manner, even if it might be only misdemeanor penalties. It still is subject to enforcement. I would disagree with that, Your Honor, respectfully, both based on the fact that it uses the passive voice is prohibited, based on the way in which other summaries are used in the Elections Procedures Manual, which I'm happy to point to. But even if the Court has concerns there, the plaintiffs still needed to show that they intended to say something specific. And if you look closely at the declarations, there's nothing specific in those two declarations in ER-221. Well, if we take the examples, and I know that you're focused on the is prohibited followed by the citation, but the Secretary of State has endeavored to provide a long list of examples that may be considered intimidating conduct that seems to include quite a bit of speech, both as the main provision says, inside and outside the zone of a voting location. I think there are a couple of pieces to that, Your Honor, so I'd like to respond to those. First of all, all of those things are examples that, depending on the context, may be intimidating. So let's take, you know, raising one's voice. Depending on what you're saying and how you're saying something, raising your voice can be relevant to whether it's intimidating. If Your Honor said, why don't we go to Copa Vida for breakfast in a normal voice, that wouldn't be intimidating. If you screamed at your colleague that same statement, that might be intimidating. It would be an odd thing to scream, obviously. Intimidating in a constitutionally prescribable way? Well, the voting location is different, right? And there's clear case law saying that the state has a strong interest in protecting the voting location, including in the election. Okay, why, so, yes, and so I think we, that's one key difference is that this guidance endeavors to reach beyond the polling location. I mean, what's your view of, does the Secretary of State have authority to provide guidance for poll workers away from voting locations? No, and we don't think this does, for several reasons, Your Honor. Well, why does it, yeah, I mean, how does outside the 75-foot limit at a voting location and then the subsequent guidance not purport to apply anywhere in Arizona? I'd like to give three reasons for that, Your Honor. First, what it means to say outside the voting location, right? So if you said, where is the Pasadena Courthouse? Oh, it's outside an Arizona voting location. Technically, that's true in that you are not inside an Arizona voting location, but that's not how normal humans use speech. I think the same is true of what's here. Outside the voting location means in the vicinity of the voting location, and that's especially true if you look at what this entire chapter is about, right? So the chapter starts conduct of elections, launch election day procedures. Wait, wait, wait, wait. Outside the voting area means in the vicinity? Yes. Even though that's not the language used? Right. The point is that it's both inside the physical building, but also in Arizona law, and this is well protected under constitutional law, there's a 75-foot limit for election year, right? So it's the area outside where people may be lining up to vote or walking into the voting location from the parking lot. It's inside the building and right outside the building. But the Secretary's had opportunities to correct this. You've disavowed criminal enforcement, but the Secretary of State has, I mean, these are regulations that govern polling workers, and so there are all sorts of consequences that could occur other than, right, particularly at a voting location where we don't want any confusion about the rules of conduct. They reavowed this extraordinarily broad language. Why shouldn't we take that as it means what it says? There were opportunities to put in vicinity or other zones, and as you've said, this is the way we usually want to talk about these areas, so we have bright lines, and they didn't. You've stayed with anywhere outside the 75-foot limit. Well, I would disagree, Your Honor, that the Secretary has reavowed the interpretation that the plaintiffs have urged. Well, reavowed the language that does not contain the limits that you're asking us to read into it. Well, after the plaintiff sued, the Secretary did not change it, and that's because the Elections Procedures Manual is on a two-year cycle. And so, yeah, you don't generally change it. And you're intending to change that in 2026? That is where the current draft stands, Your Honor, yes, and I'm happy to talk about that further if that would be helpful to the Court. And as we said in our brief, that is simply to make clear what we think has been clear and has always been clear. But I also want to turn the Court to the credible threat of enforcement problem there. Why don't they have standing, at least, just to zoom in on this question, at least where my concern is, at least to bring a Manski-style claim, a Burson v. Freeman claim, within the 75-foot where all of this stands? I think for all three of the reasons. They haven't specified what they intend to say. If you look at the declaration, there's nothing specific they intend to say. So it's not a reasonable inference that these people who are engaged in Arizona politics don't intend to vote at some point? Oh, sure, they intend to vote. But what have they said they intend to do that violates even their interpretation of the guidance? They haven't specified anything. If you look at the record, they might be able to come up with examples. But it has to be in the record before the District Court to justify the fact that they're doing this. Well, they talk about things that they want to, specific things that they want to say, things that they might want to wear. Your Honor, I respectfully disagree. If you look at the declarations on ER-221 and 239, they don't specify any of those things. Plaintiff Glennon says she is interested in talking about elections and politics. Plaintiff AFPI basically says similar things. It gives examples of things that it thinks could violate, but it doesn't even suggest that it intends that they say those things. And all of those things are normal political speech that even on their reading wouldn't violate any of the provisions of the guidance. Even if said in a loud voice? If screamed in a person's face, and the loud voice might be one thing, the proximity to a person could be another. Maybe waving your arms would be another. It's harder because the effects, as Judge Mendoza pointed out, this is kind of an unusual effects-based regulation of speech. And so it doesn't really matter what the speaker's intent is for purposes of this, the guidance's applicability. That's only true if you agree with the plaintiff's interpretation. And even if you set aside standing and go to the merits of whether they're entitled to an injunction, they have to show that there's no reasonable narrowing construction. Not that their position is arguable, but there are positions not even plausible. On the merits. On the merits, yes. And to get an injunction, they need to show a likelihood of success on the merits, right? Two governors, two attorneys general, two secretaries of state of different parties have approved this language. There have never been any prosecutions for anything under this that plaintiffs have pointed to. And so the idea that it's this sweeping restriction on speech is simply not plausible. Does it have to be prosecutions? What authority does the secretary have over, with respect to elections officials, to remove someone from a polling place or otherwise infringe potential rights at the polling place? Two things, Your Honor. First of all, there have never been any implementations of plaintiff's interpretation of this provision in the record. Civil, criminal, anything. Secondly, poll workers, they're subject to control. The counties are not even parties to this case. And so it's not even clear what the injunction actually does with respect to the people. Doesn't the EPM, isn't it, it's intended, a fact set aside, whether it can piggyback on a criminal statute for prosecution, but isn't its whole purpose to provide uniform guidance to elections workers across Arizona? That, yes, that is its purpose. Okay. And so why is that, again, on the standing analysis at least, why is that not enough, set aside questions of prosecution for an Arizona voter who's a member of the organization or Ms. Glennon, to be concerned about chilled speech that a poll worker would enforce this against them? Your Honor, to be clear, we haven't argued this.  Yeah, we haven't argued the secretary isn't a proper party. For standing purposes, our arguments are that they haven't specified what they intend to say. I think the record is clear on that. That they're wrong on the interpretation, and that there's no credible threat of enforcement based on a very clear disavowal in the record, as well as the- Criminal enforcement. Both the S.O.S. No, I don't read either the secretary of state's disavowal, which picks up on the attorney general's disavowal. Those are disavowals of criminal prosecution. There are other potential chilling effects from having poll workers who have been given guidance, which is a lot of, you've got volunteers there, you've got other people, they're given this, they're told to read it, and to do their job, this is their guidance. This is what they're told to do. I'm not aware of any civil enforcement authority the secretary has regarding county poll workers. But why isn't a poll worker saying, step outside, please leave? Not enough. Well, the question is whether there's a credible threat of enforcement, and on that, the court looks to the history. Well, I think we're disagreeing on enforcement. Why is enforcement not the threat that a voter could be kept out of a voting place or away from a voting place where they otherwise have the right to be but for this guidance? And I apologize, Your Honor. My point is that there's nothing in the record suggesting any version of enforcement, whether it's criminal or the kind Your Honor is talking about, that reflects- How long has this provision been in? Since 2019. 2019. Yes, and there's nothing that reflects the kind of enforcement based on their reading of this provision that has occurred anywhere in the history of Arizona, whether by a poll worker, a county official, a state official, none at all. No one thought it meant this. It was not controversial until basically there were some comments on this in 2023, and then they brought this lawsuit. And so it's strange to view this interpretation as this extraordinarily broad restriction on speech when we went through multiple election cycles and multiple parties endorsed this language without anyone thinking it does this very strange thing that obviously it couldn't do. I do want to turn a little bit to the canvassing provision, if I may. And there the issue is primarily its standing. The theory of injury is extraordinarily speculative. In order for the plaintiffs to be injured, a county in which they reside would have to not canvass by the county's deadline, would also have to miss the secretary's deadline. The secretary would have to fail to compel them via mandamus. Other private individuals would have to fail as well. Other remedies would fail as well. Mr. Benner, you don't raise any argument against it on the merits, right? It's just based on rises and falls on standards. On this appeal from the PI, that's correct. And largely, Your Honor, that's because it's basically a facial challenge, right? And so certainly there would be cases that would raise serious constitutional questions of applying this. There might be others where, like if there was a flood and all the ballots in the county were destroyed, there might not be serious constitutional questions of applying this. The point of standing is that the court shouldn't be forced to address a speculative situation when we're very far removed from any injury. And so our point is simply there shouldn't be an injunction on this. And the secretary has made very clear he doesn't want to have to do this. He thinks this is merely an explanation of his statutory duty. I want to go back to the intimidation arguments because I went to the record. And if you look at ER-224, they do provide examples of things that they're concerned with, their individual saying. They list those examples. So I guess I don't understand your point that they did not intend to say any of these things. That's the training they're providing, and that's what's in their declaration. Two points on that, Your Honor. Sure. First of all, they just say all of the following are examples of language that AFPI is concerned might have the effect of offending someone. They don't say here are things we intend to say. No, hold on, hold on. But to that point, though, earlier in the declaration they say we train them. These are the things that we're training them to do. Why isn't those our examples of how they are training those individuals? I didn't read that, Your Honor, to say that they're training them to say those things. I read that as them trying to get at some sort of Haven-style injury by saying here's how we train people. So I understood that differently. But secondly, I would say everything there is normal political speech that's not at all prohibited by any reasonable reading of the guidance. Someone can find some of this offensive, and certainly some people have found some of this offensive, and that's the level at which they could be removed from the polling place. With some of those very examples, people have found them quite offensive to the point where they've rioted over them. So I don't know if these are the types of things. They're examples of things. Who knows what the hot-button issue will be in the next election? But these are the things that have come up in the past elections. I apologize for speaking over you, Your Honor. I didn't mean to do that. The first sentence that we've been focusing on does not talk about language that a person may find offensive. The only thing that I think they've talked about regarding offensive language is the second bullet in the list of examples. And let me just pause to say the injunction applies to all of these examples, blocking the entrance to a voting location, disrupting voting lines, following people to their vehicles. So the injunction is clearly overbroad. But looking at that second bullet, which is an example of something that may be offensive, depending on the context, it's using offensive language to a voter or poll worker. I don't read that. I don't think anyone outside this case in Arizona has read that to mean language that is offensive to a person. In the context of threatening or insulting, that's like cursing out someone to a voter, cursing out a voter or poll worker. Now, you could say, look, we could read this one of two ways. But constitutional avoidance says, okay, read it the reasonable way. Don't reach to read it the unconstitutional way. And that's what the district court did below, and that's why we think the courts are diverse. If there are no other questions, now I'll reserve the balance of my time. Okay. Thank you.  Good morning, Your Honor, and may it please the Court. My name is John Riches. I'm joined by my colleague, Dallin Holt, and we represent the Appellee's American First Policy Institute, and Ms. Karen Glennon. The first provision that's challenged in this case threatens to disenfranchise entire counties of voters, and the second criminalizes protected speech based on subjective offense. The district court rightly enjoined both of those provisions, and I think it's important to put a fine point on the standard of review that is at issue here. This court, that decision ---- I think we understand the standard. Could you address the canvassing portion of this? Because I think that's an area that I want to make sure I understand your argument and how it is that you believe that the court is correct there. Yes. Yes, Judge Mendoza. Well, on the merits, as the Court previously pointed out, the State fails to raise any defense whatsoever on the constitutional merits of this provision. Any defense is therefore waived, and I think that's probably telling. This is so patently unconstitutional. The district court referred to it as a nuclear bomb that is probably unprecedented in the history of the United States. But how likely is it? How concrete and real is it? Very, Your Honor, and here's why. Appellees have to show that there is a threat of disenfranchisement, and there's a line of cases that say voters have standing to bring those sorts of cases. Burdick is probably the best one. But in this case, there's a credible threat of enforcement for three reasons. The first is the language is mandatory. It says that the Secretary must proceed with the State canvass without including the votes of the missing county, must proceed. I think it's also telling that that same language was promulgated by the Secretary himself, but then directs the Secretary to proceed with the canvass without counting the votes. Counsel, we're not operating here in a vacuum, right? We know what happens, right, because it happened once before. And in that case, wasn't it the case that the Secretary then, in fact, sued and the ballots were, in fact, counted? So why isn't the history here suggest that really there is no threat or eminent threat? Well, we think the history suggests exactly the opposite, Your Honor, for the reason Your Honor stated. So the only thing that would have to happen in order for literally an entire county's or county's votes to be not counted is exactly what happened in 2022. And in that case, you had a county board of supervisors who refused to certify the elections, and then you had the right remedy. The right remedy was the Secretary going to seek mandamus relief, which in Arizona can go directly to the Arizona Supreme Court. And that's precisely what happened. The right remedy is not we're tossing all of those votes out, which is what the EPM mandates. Was the mandamus remedy in part based on 16648? I'm sorry? The underlying statute that you don't challenge here? So the canvassing statute that is cited in the guidance, was the mandamus remedy in part based on enforcing that statute? Correct, Your Honor, yeah. But you don't challenge that statute. To what extent do you view, we've talked a little bit about it on the voter intimidation side, but on the canvassing side, what are the material differences you're seeing that even if the executive had the ability to make law, which I don't think is true either at the federal or the state level, but aside from that, what are the material differences that you're worried about in the guidance that isn't present in the unchallenged state statute? The difference between when and how, Your Honor? The statute just says when the canvass must take place, and it's effectively three days after the county canvass, the statewide canvass, three days after the county canvass. The statute says nothing about it. Doesn't it say shall canvass? Correct, but that indicates the date by which the canvass must be done. But it was also the grounds then of the mandamus that the secretary sought. So it seems like they're both trying to accomplish the same thing, and you haven't actually challenged the law. Well, we don't think we have to because we're not challenging. In fact, we do not have to. We're not challenging when the canvass must take place. We're challenging the extraordinary remedy that the secretary has imposed if the canvass does not take place by that date. So there's not a statutory obligation for the secretary of state to canvass the election, the certified copies of the official canvass received from the counties? There is that statutory obligation, but it occurs after the county canvass. And so if you had a situation like in 2022 where you had a wayward county that's refusing to certify, then the secretary still has other remedies available to him to force that certification so that he can then. But it's not just the secretary, right? Any individual. Any individual can seek mandamus, correct? Your Honor, that is true, but I think if we were to accept the proposition that the right to vote can be held hostage and the only remedy that's available to a voter is to rush to court and say that the secretary. But counsel, you're having to then assume that the county is not going to count the votes and is not going to canvass, and we have to then assume that they're going to violate the law and we have to then assume that we have to. So there's a series of assumptions that we have to make in order to get to the point that there's a violation here. But, Your Honor, those are safe assumptions given what we know has already happened and what could very likely happen again. So you not only have the 2022 example, but in 2024 a Pinal County supervisor publicly said he will raise concerns when the supervisors meet that there's strong evidence that cheating occurred in the election. So you had in the very next election cycle yet another county official saying that he may not vote to certify the election. So we think those are quite safe assumptions based on what has already happened. But more to the point, Your Honor, the secretary himself has refused to disavow the nullification provision and the extraordinary power that it grants his office. He was sent a request to disavow the nullification provision or the canvass provision, and he said he cannot and will not disavow that. That, again, is not speculative. But also will take all necessary measures to ensure that the votes are counted. Well, one of those necessary measures under the plain language of the EPM, Your Honor, is to discard the votes. And that's the threat he's holding over the voters of all 15 counties in the state of Arizona. And I think that's the real nub of it. But if you don't meet the deadline, then all the other votes are effectively discarded, right? At some point, the deadlines, if you can't canvass any of the other votes, and fortunately this didn't happen, but I think the secretary would say that his concern is that if you don't have votes from one county, and the rest of the counties are on the line, particularly with respect to federal election deadlines, all of those other votes are canceled. Well, what should happen in that situation, Judge Johnstone? Exactly what did happen. The secretary has other remedies available to him that are much more tailored, that are much less egregious, that are much less nuclear, than discarding the votes of entire counties. And he did exactly what he ought to have done in that situation. He went to court, he got mandamus relief, and that order was entered such that the secretary could carry out his nondiscretionary duty to canvass the election without having to threaten entire disenfranchisement of potentially millions of voters. Turning, Your Honor, to the speech provision. I've got a question about your framing of the speech provision. I see, I mean, I think you led with more of a, maybe not led, but you'd raised more of a Mansky traditional claim around the polling place in the district court. You still preserve it here. It's in your briefs here. But you open with the assertion that the secretary has created a new strict liability speech crime that has no precedent under Arizona law. Is it arguable that the secretary of state has the legal authority in Arizona to create speech crimes? I think it is arguable, yes, Your Honor. And I think that that makes it sort of doubly troubling as to what the secretary elected to do here. The reason it creates whole new categories of speech crimes is because, as Your Honor pointed out when having a discussion with my friends on the other side, this applies both inside and outside of the polling location. It eliminates the mens rea requirement that exists in state law, introduces an entirely new term, which happens to be subjective, of harassing that doesn't exist. But I think, I mean, your argument must depend, must it not, on the incorporation of a statute? Are you arguing that the secretary's diktat here can simply bring a criminal prosecution based on this guidance alone without the intermediation of the statute? It incorporates, Your Honor, state law that makes a violation of the EPM a misdemeanor. Okay. So then it turns on that piece. There doesn't seem to be a lot of guidance in Arizona law. I think that you both cited a few cases about how tight that connection is. So, you know, I think in typical states in terms of a secretary of state, there's the list of there's laws that generally govern election processes. And messing with those might be one sort of crime here, a misdemeanor under the statute, and then separate voter intimidation protections, which would be the more obvious place for this to fall. But your argument is that this is, is it that it's bootstrapped into the general election processes provision? What is that, 346? Or six, yeah. So state law itself makes a violation of the EPM its own separate, stand-alone criminal misdemeanor. So that's the, I mean, that's part of the problem here. You haven't named any of the county attorneys as defendants here. The Isakson case has come up. But in Isakson, isn't it distinguishable because in that case the plaintiffs had named the county attorneys and so that, of course, they did have standing where there isn't a disavowal to restrain the county attorney defendants. But you haven't named them here. Well, I think that goes to the chill aspect of this, Your Honor. So, and by the way, there's no disavowal from the Secretary of State, although the AG gave something of a convenient disavowal for its litigation position. I think the Secretary of State can be read as picking up on the criminal side. On the criminal side. So not dealing with people's ability to be removed. But how can you assert from a chill from the county attorneys? I mean, the typical thing often in constitutional litigation and election litigation, you've got lots of officials. Put them in the caption. Well, as to why they weren't in the caption, I don't know, Your Honor, but it does not remove the fact that county attorneys have independent enforcement authority here. So if I'm a speaker, if I'm your average Arizona citizen, and I want to express a political opinion that might be controversial, the threat that both the attorney general and all 15 county attorneys can prosecute me is still out there. And as we have unrebutted evidence from the declaration, that is currently injuring our clients. They are currently self-censoring as a result of this potential for criminal liability, both from the state and from the county. What do you say to their argument that when we said 75 feet or outside of that 75 feet area, that that was not what they intended and that's not how they're intending to enforce that argument? So I found it interesting that one of my friend's primary arguments was that this was an implausible reading. That's the plain language. No, one of his arguments was that your clients could come to the Pasadena courthouse and make their offensive comments. And that would not be enforced or enforceable. The problem is that is not that's not what the language says. So, yeah, they haven't limited what outside means. Correct. And really the obligation on this court, as the United States Supreme Court has said, and Stevens and every other case is not to rewrite the law. It's the state here that would ask this court to rewrite the plain language of these speech restrictions. The language says precisely what it says. I guess the problem is, is that this is to the extent it is law. It's only law via maybe arguable, certainly contested, intermediation of the election process misdemeanor. So with respect to just the guidance, and this is something I pursued a little bit with your friend, what do you understand the potential, if we take criminal, setting aside criminal enforcement, what are your claims with respect to poll workers and the kind of heartland of the people who are governed by this? I mean, this is this is an executive action, not a legislative action. So what it's doing is governing, generally providing guidance for elections workers, people in that system. So what are your claims about chill or potential enforcement, not by prosecutors, but by polling workers? And, of course, Your Honor, we do disagree with the characterization that this is just direction to poll workers. Once again, the plain language says any person and then goes on to spell out what the behavior is that doesn't just apply to poll workers. Well, right. In other words, like much executive guidance, it indirectly governs private conduct. But it's private. It's direct governance is saying you government officials to provide for uniform enforcement of these laws. We want you to enforce the voter intimidation law or other processes by these ways. So so if we assume that it's only polling workers that might provide a threat, what does that enforcement look like for you? Potentially removal from the voting pool, from the voting polling stations, the inability of individuals to express themselves. Is there any authority that you'd cite in the E.P.M. or elsewhere that confers that? Yeah, the E.P.M. has provisions in terms of what happens when there's disruptive when there's disruptive, you know, conduct out of polling places. And it directs election officials as to what to do in the provision itself. Your Honor. And this is at D. So E.R. 217 D. The officer in charge of elections has a responsibility to train poll workers and establish policies to prevent the conduct that's been listed. So this is the guidance that's given to all the election officials that are then supervising these sorts of elections. Interestingly, as to our plaintiffs specifically, AFPI, it's unrebutted evidence in their declarations, a paragraph four of their declaration that one of their primary functions is to train poll workers. Well, you bring kind of a you make some Mansky type allegations about what's going to speech at the polling place. But as the passage that Judge Mendoza spoke about, your declarations aren't entirely specific about that claim. I think I think it'd be fair to say that you read the guidance very broadly. And the speech that you're claiming might be chilled is equally broad. Could you point us to something that would would support if we're if we might be worried mostly about what's going on at the polling place? Best support standing on that ground. Sure. And again, I think the most important piece of both declarations, again, which is unrebutted, is the chill that has already occurred. Both of our clients have testified that as a result of these speech restrictions, they are not engaging in speech. They would otherwise engage in that's both E.R. to 21. And then in the Glennon declaration. But even under dry house, we need a little more than that. So what's the nexus here to what's going to happen on the ground under this guidance? Additionally, and Judge Mendoza made this observation in his in his discussion as well. There's a whole list of activities at E.R. to 20 to 24 that that AFP I says would fall under. But where are those happening and what's the time, place and manner of those activities? Are they happening at home? Is someone looking at something that's upsetting on the phone and yelling at their screen? We have enough there. And to add to his question, we're in your declaration. Does it say that that those are the things that were intended to be said by by the declarant? So the declarant doesn't have an obligation to come up with everything the declarant might possibly say at some point. When he or she is engaging in run of the mill political speech, the declarants have testified in an unrebutted way that they themselves have already self censored by saying by not saying things they would otherwise say. And under this court's decision and protect marriage, a credible threat exists when a plaintiff self censors due to the threatened enforcement. And there is simply unrebutted evidence of the self censorship that's already occurred, that's continuing to occur, to occur. And that will occur if these provisions if the injunction is lifted against these provisions. Could the declarations have been more specific about things that they intended to say? Your Honor, there's no obligation again in a situation like this where we're dealing with core political speech. We can't ask a speaker, tell me the, you know, the hundreds or thousands of things you may say that somebody else may perceive as subjectively offensive or harassing. So what I'm imagining is that beyond the 75 foot line, your clients may want to stand there silently or not wearing t-shirts, hats, whatever, colors that speak to the issues that will be presented in the next election, whatever those may be. You can't really be specific about because we don't really know what's going to be the hot button issue at the next election. That's a very good point, Your Honor. And if you use the examples that are in the declaration, such as Israel has a right to exist, or maybe an Israeli Defense Forces t-shirt that somebody might find offensive or harassing, that would fall within the plain language of the guidelines. And our clients have testified that that has caused them to self censor as a result. I see that my time is up, Your Honor, if there's no more questions. All right. Thank you, Counsel. Mr. Bendor. Thank you, Your Honor. I want to start with speech provision. Under the Arizona statute, violation of the EPM is a misdemeanor only if it's a violation of a rule. So the question is, is this a rule? And I want to give another example from the same chapter of the EPM, and this is ER 386. And that's under the checking voter identification section. And it says, voters are required to prove identity at the polling voting location before receiving a ballot on election day. And it cites the relevant statute. That's clearly a summary of existing Arizona law. And if a voter fails to provide identification, they're not prosecuted for a misdemeanor. As the section later explains, they get a conditional provisional ballot, and they can try to come back and show their ID later. So that shows you sometimes the EPM is just summarizing other law. And that's what this section is. I would add also the EPM is for elections workers. That's what the very first page says. And there's not a single provision there that I would read to impose a direct obligation on the members of the general public. And so I think courts should impose some sort of a clear statement rule before the government, the secretary of state, or the attorney general, who are going to assert that something in the EPM does what, in our view, it never does. Why isn't it enough for standing purposes, at least, that the connection of an election worker following this guidance could do something to chill the plaintiff's speech? I mean, I don't think it's enough because I don't think it's even arguably prescribed, and because I don't think they've been specific and there's no credible threat of enforcement. But again, even if you get there, to get an injunction, they need more than standing. They need to show that our view of this language isn't even plausible in order for the district not to do it. Okay, let's make it easier to say that. Let's assume the guidance was clearly unconstitutional. Would it be a defense to either standing or the merits on an injunction to simply say, well, the secretary of state has put some guidance out there, but who knows? No one follows that. No one's going to get hurt. No one's going to be prevented from voting, even though the secretary of state is telling poll place workers to enforce it. I think it would be much closer. I think under this Court's case law and Supreme Court case law, you still have to look at do they have a specific plan to violate it. For the court to have jurisdiction over a dispute between these plaintiffs and these defendants, you'd also need to have a credible threat of enforcement. That may be different in the facts Your Honor lays out, but I don't think that's what we have here. Last, I just want to point to the section of the EPM this is in. Within Chapter 9, it's Section 3, which is entitled Preserving Order at the Voting Location. I think that shows what all reasonable inferences show, which is this. This is about preserving order at the voting location, not somewhere else, and for those reasons, the reasonable interpretation given by the defendants is the one this district court should have adopted. No further questions? All right. Thank you, Counsel. American Encore v. Fontes is submitted, and this session of the court is adjourned for today. Thank you. All rise. This court for this session stands adjourned.
judges: WARDLAW, MENDOZA, JOHNSTONE